FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

99 FEB -3 PM 3: 09

U.S. DISTRICT COURT
N.D. OF ALABAMA

Copy

ENTERED

FEB - 3 1999,

WILLENE M. HUDDLESTON,           )
                                 )
       Plaintiff,                )
                                 )
    vs.                          )      CV 97-PT-2293-E
                                 )
CLEBURNE COUNTY BOARD OF         )
EDUCATION; DANNY MOBLEY;         )
                                 )
       Defendants.               )
                                 )

MEMORANDUM OPINION

This cause comes to be heard on defendants Cleburne County Board of Education and Danny

Mobley's Motion for Summary Judgment filed on December 4, 1998.

I. Nature of the Claim and Factual Background

Plaintiff Willene Huddleston ("Huddleston"), a teacher employed by defendant Cleburne

County Board of Education (the "Board"), filed a complaint on August 28, 1997, against the Board,

its members, and superintendent, pursuant to 42 U.S.C. 2000(e), et seq., and 42 U.S.C. 1983,

alleging that the defendants discriminated against her on the basis of sex in failing to promote her

to the position of principal of Fruithurst Elementary School in July of 1995.[1]

Huddleston has been employed as an elementary school teacher by the Board since 1970.

---

[1] Although it appears that the alleged discrimination may have taken place more than two
years prior to the filing of the complaint, the defendants have apparently not asserted the statute
of limitations as a defense to the Huddleston's § 1983 claim.



2

In 1993, Huddleston became certified in school administration. The first administrative position for which she applied was the position giving rise to this lawsuit – principal of Fruithurst Elementary School. Huddleston applied for the position when the position became vacant as a result of the Board's election not to offer another year of employment to the woman who had been principal at Fruithurst for the previous two years. Including Huddleston, a total of eight people applied for the position, two females and six males.

Under Alabama law, each school board hiring decision is made upon the recommendation of the school superintendent. Mr. Robert Morton served as the superintendent of education for the Board in 1995 and played the major role in determining who the Board should hire to fill the position of principal at Fruithurst Elementary. Mr. Morton collected references, conducted interviews, and made a recommendation to the Board as to whom he thought should be hired. Morton recommended Mr. Ricky Murphy over all of the other candidates, including Ms. Huddleston. The Board unanimously agreed with Morton's recommendation.

When she applied for the principal position at Fruithurst, Huddleston had twenty-four years of teaching experience in Cleburne County at the elementary school level, a Masters degree in Administration and Supervision, an Educational Specialist degree (Ed.S.), had earned an "AA" Administrator Certification for grades N-12, and had completed extensive post-graduate work. Ms. Huddleston feels that, by all objective measures, she was the most qualified applicant for the job. When hired by the Board, Murphy had taught at Cleburne High School from 1988 until 1992, and had then taught in Randolph County. Mr. Murphy had eight years of teaching experience, but no experience in elementary schools. Murphy had also earned a Masters degree in Administration and Supervision, but had not received any Ed.S. degree. Further, Murphy's certification level was "A",

3

as opposed to Huddleston's "AA".

Morton contends that the hiring decision was a result of the weighing of a number of factors. Morton claims that, although experience and educational level were considered in assessing the qualifications of the applicants, once a candidate was established as qualified for the position, factors outside of experience and educational level became increasingly important. The method allegedly used by Morton in making his decision is outlined below.

## A. Morton's Description of the Screening and Hiring Process

According to Morton, in order to be considered for the position of principal, a candidate had to fulfill certain minimum requirements. The minimum requirements called for an applicant, among other things, to hold an M.S. Degree in Administration from an accredited institution and to be a resident of Cleburne County commencing with his or her contract of employment. It is undisputed that Huddleston, Murphy and each of the other candidates screened and interviewed by Morton fulfilled the minimum requirements.

Having established that the candidates fulfilled the minimum requirements, Morton obtained references for all of the candidates by sending reference forms to each applicant's present and past supervising principal in the county. Morton then applied a numerical scale to the ratings placed on the references by the candidate's supervisors (5-superior, 3-good, 2-average, 1-fair, 0-poor). After obtaining the references, Morton and the Board interviewed each candidate. Each candidate was asked the same questions during their interview. Morton rated each applicant with a numerical score on a form entitled "Interview Rating Scale." Following the completion of the interview process, Morton added each applicant's score from the references to that applicant's interview score to arrive at a total. The applicant with the highest score was Mr. Murphy, whose total was 104.5. Ms.

4

Huddleston's score was 80.

Mr. Morton contends that the hiring decision hinged primarily upon the references obtained and the interview conducted rather than on other factors. Although the score received by an applicant as a result of the interview process was influenced by an applicant's educational background and experience, such factors were not given priority over other considerations. Both Huddleston and Murphy received a "5" for "educational experience," despite the fact that Huddleston had more experience and training. Further, the "educational experience" factor was only one of eleven different categories that were ranked in the interview, and was given no more weight than any other factor on the Interview Rating Scale. Huddleston received a score of 38 on her interview. Murphy received a 53. Morton, as a result of the interview, awarded Huddleston lower scores than Murphy in the categories of "Ability to Plan and Organize," "Administrative Skills," "Communication Skills," "Adaptability to Change," "Common Sense," "Community Relations," "Cooperation With Administration," "Relationship With Teachers and Students," and "Work Habits."

Murphy also scored better than Ms. Huddleston as a result of the references collected by Morton. Both Murphy and Huddleston received reference evaluations from Jimmy Pirkle. Mr. Pirkle had served as a principal and supervisor over both candidates during different periods of time. Pirkle also provided references for three of the other candidates.

Pirkle served as principal over Huddleston for only one year. In his reference form for Huddleston, Pirkle wrote:

*Would you employ applicant if you had a vacancy?* (Yes – as a teacher) She did a good job. As an administrator I can't say, I would just be guessing but I probably

would not hire her.

*Comments:* I really feel it would be a huge change for her to make. I'm really not sure if she could handle it. A big question mark.

Pirkle gave Huddleston "Superior" or "Good" scores in all but 5 of the 14 categories on the reference form. She received an "Average' score for "Emotional Maturity," "Common Sense," "Professional Attitude," "Adaptability to New Ideas," and "Ability to Plan and Organize."

Pirkle supervised Murphy for four years. In his reference form for Murphy, Pirkle stated:

*Would you employ applicant if you had a vacancy?* Yes (would be a good elementary principal in my opinion).

*Comments:* Rick is enthusiastic about becoming a principal. He possesses the "people skills" to be a good one. He is very conscientious and responds well to suggestions – good young prospect!!

Pirkle also gave Murphy either "Superior" or "Good" scores in every category on the reference sheet except "Emotional Maturity," in which Murphy received an "Average" score.

Pirkle's evaluations of the other three candidates, all males, stated that he would not hire any of them as a principal. Additionally, the scores he gave each of them on the reference form were below the scores he gave to Murphy and Huddleston. Although Pirkle's evaluation of Huddleston was "unfavorable" in comparison to Murphy's, his assessment of her teaching abilities and her potential as an administrator was reasonably, if not completely, "favorable" when compared to the other candidates reviewed by Pirkle.

In addition to Pirkle's reference, Huddleston also received a reference evaluation from Robert Chambless, who was her supervising principal at the time. In his reference form for Huddleston, Chambless stated that he was unsure as to whether or not he would hire her for an administrative position and that, although she was a good teacher, she, at times, had problems working with both himself and some other teachers. Chambless gave Huddleston a "Fair" ranking in both "Professional Attitude" and "Cooperation With Administration."

The forms used for the references have, according to Morton, been used by the county for quite some time. He did not provide the principals with any instructions as to how to fill out the reference forms. Rather, he allowed them to fill out the forms as they saw fit.

After receiving the references, Morton, as stated above, assigned scores to the categories and came up with a total reference score for each candidate. Because Huddleston received two references, Morton took the average of the two in assigning her a score. Huddleston's reference score totaled 39. Murphy received a 47. Additionally, in tallying the final scores, Morton noted at the bottom of Huddleston's sheet that "References would not hire as administrator." The bottom of Murphy's sheet read "References would hire him." Morton claims to have placed heavy emphasis on the references because the persons providing those references were people who had direct experience in working with the individuals being reviewed. According to Morton, the fact that the people providing the references had worked with the applicants was very important to him.

Morton contends that, in addition to her having received references that were inferior to those provided for Murphy, Huddleston's position was further weakened by the fact that she had allegedly been involved in conflicts with the System's Assistant Superintendent Rudy Payne and with Special Education Coordinator Kathy Sage. According to Morton, he had been informed that Huddleston

once, in the presence of students and other teachers, called Sage a "high-flying bitch." He also claims to have known about an incident between Huddleston and Payne at the time he was making his decision.[2] Morton further testified that approximately ten teachers sought him out to advise him that they did not want Huddleston to get the job. Morton claims that, although he did not put much emphasis on the opinions of the teachers, he did consider the conflict with Ms. Sage. Huddleston contends that she has never had any conflict with Ms. Sage.

Overall, Morton claims that Murphy was selected over Huddleston because he felt that her communication skills as an administrator were not as strong as Murphy's. He placed special emphasis on the fact that Chambless's evaluation stated that Huddleston had been involved with several conflicts with him and with other teachers and the fact that the references he received indicated doubts as to her ability to administer. Morton contends that, given those problems and questions about Huddleston's ability to work with and supervise others, he had very little difficulty in choosing Murphy over Huddleston.

## II. Defendants' Arguments

Based upon her view of the subjective evidence weighed by the superintendent and upon the fact that she was more qualified when it came to objective criteria such as experience and education level, Huddleston claims that she was passed over for the position because of her gender and that the Board, as a result, hired a candidate who was less qualified for the position than she. Defendants, however, claim that Huddleston was not as well qualified for the position as Murphy and that, in any

_____

[2] Huddleston argues, infra, that the Payne incident had not yet occurred when the hiring decision was made and that Morton could, therefore, not have considered it in making his decision.

case, they had legitimate, nondiscriminatory reasons for hiring Murphy over her.

## A. Prima Facie Case

Defendants' first contention is that Huddleston cannot establish a prima facie case of discrimination in that she was not as qualified for the position as Mr. Murphy. As a plaintiff in a sexual discrimination case, Huddleston bears the burden of persuasion and must initially establish a prima facie case of discrimination. Walker v. NationsBank, 53 F.3d 1548, 1555 (11th Cir. 1995). Plaintiff may do so either through producing direct evidence of discriminatory intent, Alpin v. Sears, Roebuck & Co., 940 F.2d 1497, 1501 (11th Cir. 1991), by offering statistical proof of a pattern and practice of discrimination, Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989), or by providing circumstantial evidence sufficient to allow an inference of discrimination as articulated in McDonald Douglas Corp. v. Green, 411 U.S. 792, 793 (1973) and later repeated in cases such as Carter v. Three Springs Residential Treatment, 132 F.3d 635 (11th Cir. 1998).

Huddleston has not produced either direct or statistical evidence to substantiate her claim and must, therefore, rely on circumstantial evidence. To establish a prima facie case of discriminatory failure to promote, Huddleston, under McDonald Douglas and Carter v. Three Springs, must show that: (1) she is a member of a protected class; (2) she was qualified for the position for which she applied; (3) she was rejected; and (4) the position was filled by a person outside of the protected class who was equally or less qualified. McDonald Douglas, 411 U.S. at 803; Carter v. Three Springs, 132 F.3d at 642.

Defendants have, for the purposes of their summary judgment motion, conceded the existence of the first three elements necessary to establish a prima facie case. The defendants maintain, however, that, given the criteria used by Morton in determining who should be hired by the Board,

Murphy was better qualified than Huddleston for the position. Morton recognized that Huddleston had more experience and education than Murphy, but considered those factors to be less significant than others. Thus, the education level of an applicant was used primarily as a minimum requirement screening device. According to Morton, education beyond the minimum required level was not considered for any of the candidates, male or female. Both educational level and teaching experience could have influenced a number of the factors used in both the interview and the reference forms, but appear to have been primarily dealt with in the "Educational Experience" category of the interview form. As noted above, Morton gave both Murphy and Huddleston a "Superior" ranking in that category.

Morton does not characterize Huddleston's failure to get the job as a function of any perceived shortcomings in her experience as a teacher, her ability to teach, or in the depth of her educational background. Rather, Morton's deposition testimony indicates that, as a result of the interview and of the references submitted on her behalf, he had doubts about her ability to effectively communicate and administer as a principal. Morton claims to have measured the applicants' communication and administrative skills as fairly as possible and to have been as consistent as possible. In doing so, Morton found that Mr. Murphy appeared to be the superior candidate. Defendants thus contend that Huddleston was not equally or more qualified than Murphy for the position of principal of Fruithurst Elementary School and that Huddleston cannot, therefore, establish a prima facie case of discrimination.

**B. Defendants' Legitimate, Nondiscriminatory Reasons for the Decision**

Defendants also claim, based on their argument outlined above, that Morton and the Board relied upon legitimate nondiscriminatory reasons in selecting Murphy over Huddleston. After a

10

plaintiff has presented a prima facie case, the burden of production shifts to the defendant, requiring

an articulation of some "legitimate, nondiscriminatory reason" for the alleged discriminatory action.

Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). Defendants contend that

Morton's reasons for not hiring Huddleston, as stated above, are not pretextual and that they have

established that Morton had ample reason for doubting Huddleston's communication abilities and

for believing that Murphy was a superior candidate.

Defendants, in further attempting to rebut plaintiff's claim that Morton's reasons for not

hiring Huddleston are mere pretext, also note that when the same principal's position at Fruithurst

had opened up two years prior to 1995, Morton and the Board had hired a woman for the job.

According to Morton, the applicants for the 1993 opening were essentially the same as those who

applied for the 1995 opening, with the exception of Ms. Huddleston. Even Mr. Murphy had applied

for the position. Nonetheless, Morton and the Board, which was composed of the same members

as in 1995, selected a woman, Diane Turley, for the position. Morton claims that Turley was

selected because of the references he received on her behalf and because of his personal knowledge

of her abilities. The defendants contend that Morton's recommendation and the Board's hiring of

a woman for the very same position just two years prior to the hiring of Murphy indicates that

Morton's reasons for not hiring Huddleston were not mere pretext.

### III. Huddleston's Response

#### A. Prima Facie Case; Huddleston's Comparative Qualifications

Huddleston claims that the defendants' characterization of Murphy as a superior candidate

is clearly false in light of the evidence. She contends that she was not only equally as qualified as

11

Murphy, but was superior in every accurately measurable respect.[3] Huddleston contends that, with respect to the objective criteria used by Morton in considering applicants for the position, her qualifications far outshone those of Mr. Murphy. In his deposition testimony, Morton acknowledged that, all things being equal, a person with more years of teaching experience is more qualified for a principal's position than a person with less teaching experience. He also conceded that a person with an Ed.S. degree is more qualified than a person holding only a Masters. He further agreed that a person with experience in elementary school education is more qualified than one without such experience for an elementary school principal position. Finally, he acknowledged that each of the above factors were objective in nature and that he had taken such factors into account in formulating an opinion about the qualifications of the applicants.[4] Defendants have not contested the fact that Huddleston had more experience, more education, a higher certification level, and more elementary school experience than did Murphy. Based on the objective criteria that could be used in selecting a candidate, Huddleston claims that a jury could easily determine, in the light most favorable to her and when drawing all reasonable inferences in her favor, that she was objectively more qualified than Murphy for the position. She claims, therefore, to have established a prima facie case of sexual

---

[3] Huddleston also notes that, because of the Cleburne County school system's minority hiring preference policy, as described by Morton, the school system should give preference to minority candidates who are equally as qualified for a position as nonminorities. Thus, even if a jury were to find that Huddleston was only equally as qualified as Murphy, they could find that Huddleston should have been awarded the position.

[4] Huddleston, in addition to alleging that she was better qualified than Murphy according to any objective criteria, challenges the defendants' characterization of her communications skills. She points out that neither her personnel file, nor her teacher evaluation forms indicate any performance related criticisms or concerns. Further, Huddleston notes that nothing in her record indicates that she has ever had any difficulties in interacting with students, teachers, parents or administrators.

12

discrimination.

### B. Argument Against Defendants' Legitimate, Nondiscriminatory Reasons

Huddleston contends that the defendants' arguments regarding the methodology behind the

Morton's decision to recommend Murphy and the Board's decision to hire him are properly

characterized not as reasons why Huddleston was less qualified than Murphy, but only as the

defendants' proffer of "legitimate, nondiscriminatory" reasons explaining the decision. "At the

summary judgment stage, once an employer articulates a legitimate, nondiscriminatory reason for

the [adverse employment decision], the burden shifts back to the plaintiff to raise a genuine factual

question as to whether the stated reason is mere pretext." Corbin v. Southland Intl. Trucks, 9 F.3d

913 (11th Cir. 1994). The plaintiff must show that there is sufficient evidence to enable a jury to

return a verdict in her favor – the plaintiff must provide sufficient evidence to permit a reasonable

factfinder to conclude that the reasons given by the employer were not the real reasons for the

adverse employment decision. Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997);

Lewis-Calhoun v. City of Jackson, 977 F.Supp. 1148, 1151 (S.D.Ala. 1997). The plaintiff may

prove that the defendant intentionally discriminated against her either "directly by persuading the

court that a discriminatory reason more likely motivated the employer or indirectly by showing that

the employer's proffered explanation is unworthy of credence." Carter v. City of Miami, 870 F.2d

at 584.

In the present case, the defendants have articulated as their legitimate, nondiscriminatory

reason for selecting Murphy over Huddleston that Huddleston's "communication skills as an

administrator [were] not as high" as Murphy's. Huddleston points out that Morton identified three

sources of information which aided him in coming to this conclusion: (1) the reference forms

submitted for Huddleston; (2) the alleged conflicts Huddleston had with other school employees and officials; and (3) Morton's evaluation of Huddleston's interview vis-a-vis Murphy's. Huddleston claims that there exists substantial evidence from which a reasonable finder of fact could determine both that a discriminatory reason more likely motivated Morton and the Board and that the explanation provided for Huddleston's rejection is unworthy of belief.

## 1. Objective Criteria Ignored

Huddleston characterizes the defendants' explanation for awarding Murphy the job over Huddleston as unworthy of belief for several reasons. The first reason Huddleston offers to disbelieve the defendants' explanation is that Morton, in selecting Murphy, relied solely upon subjective factors. Morton, as stated above, has acknowledged that the factors he considered in recommending Murphy over Huddleston were subjective and that he did not expressly give any sort of credit or higher priority to those applicants possessing experience and education beyond the minimum requirements for the job. Morton also admits to having given both Murphy and Huddleston a "Superior" rating in "Educational Experience," despite the fact that Huddleston had more experience and education.

## 2. Reference Forms

Just like his disregard for Huddleston's higher level of education and experience, Morton's heavy reliance on the reference forms exhibits, according to Huddleston, the unreliable and subjective nature of his screening and interview process. Huddleston notes that Cleburne County's Personnel Policy explicitly calls for each applicant to furnish references. Huddleston claims that she was discouraged from doing so because she had worked in the county and that Morton then solicited references from administrators on her behalf. Murphy, on the other hand, was apparently allowed

to seek out his own references, though the only reference considered for him came from Mr. Pirkle, an administrator in the Cleburne County School System.

Huddleston claims that Morton's alleged reliance on the references supplied by Pirkle and Chambless was unreasonable, unjustified and unfair and that, given the questions and concerns one should have had about the reliability of both of the references, a jury could find that Morton did not really rely on them. Pirkle's evaluation, according to Huddleston, was flawed by the fact that he communicated, both orally and in writing, his inability to accurately determine whether or not she was qualified for the position due to the fact that he had only supervised her for a single year. Pirkle's deposition testimony indicates that his comments were not meant to be construed as "unfavorable," but simply to reflect a lack of knowledge about her abilities. Huddleston contends that Morton's reliance on a reference that he knew the evaluator was uncomfortable in providing could lead a jury to conclude that Morton was seeking out a pretextual reason to justify a predetermined outcome.

Huddleston also characterizes the reference evaluation provided by Chambless as suspect. Huddleston depicts Chambless as a poor administrator prone to conflict with parents, staff and administrators. One member of the Board, Mr. Ted Lee Campbell, testified during his deposition that Chambless was a poor administrator and that he had a reputation for having a temper and for directing it toward teachers. Huddleston also points out that even Chambless acknowledged the fact that at least one teacher had complained about the manner in which he treated her. Huddleston thus claims that Chambless was a poor choice for a reference and that his selection by Morton was unjustified (despite the fact that Chambless was, at the time, her immediate supervisor). She claims that, had she been allowed to provide her own references, she would have gotten better reviews.

From this information, Huddleston argues that a reasonable jury could infer that Morton intentionally sought out persons who he knew would provide references that would give him grounds for denying Huddleston the promotion. Morton has admitted that the information provided on the reference forms was subjective in nature and based upon the evaluator's experience with a given applicant. She concludes that the above considerations could lead a jury to conclude that Morton did not really rely upon the references at all, but that he simply used them as pretextual support for his discriminatory decision.

Huddleston contends that Morton's attempt to quantify subjective criteria in the manner outlined above amounts to nothing more than speculation and caprice. She thus contends that any reasonable juror could conclude that Morton's method of rating and ranking applicants was inherently unfair and formulated in a manner designed to hide discriminatory intent. Huddleston points to the Eleventh Circuit's decision in Williams v. City of Montgomery, 742 F.2d 586 (11th Cir. 1984), in arguing that subjective criteria are inherently suspect and "insufficient to establish a 'legitimate, nondiscriminatory reason'"for explaining an adverse employment decision. She maintains that, according to the law as outlined in Williams, this court cannot grant summary judgment on the basis of the defendants' proffered explanation, which is, in essence, entirely subjective in nature.

### C. Huddleston's Other Allegations Concerning the Defendants' Proffered Explanation

Huddleston also argues that Morton's reliance on both the reference forms and the rumors about applicants was suspect given the way he describes his method of disciplining and evaluating school system employees. Morton testified in his deposition that it was his practice, both in disciplining employees and in evaluating them for promotion, to deal very directly with personnel,

to make sure that employees knew what their duties and responsibilities were, to make sure that they knew when they failed to meet expectations, and to make sure that they were given notice of problems and had an opportunity to correct them. He also testified that he did not want to hear about past transgressions or conflicts of the employees that he was not already aware of, and that if he had any problem with an employee, that employee would know about it. Huddleston argues that Morton's testimony about his discipline and evaluation policy is inconsistent with his approach to evaluating her. Huddleston claims that she was never criticized in any way about the manner in which she dealt with others and that Morton, despite his testimony about discussing problems "up front" with personnel, never discussed with her any perceived concerns about her communications skills. Additionally, Morton never confronted Huddleston about the alleged incident with Ms. Sage, but admits to having considered the incident in making his hiring decision without having offered her the chance to address his concerns.

Morton testified during his deposition that, in deciding against Huddleston, he had considered the fact that she had been involved in a conflict of some sort with Rudy Payne, a Central Office Administrator. However, Morton testified that he did not bring the matter to Huddleston's attention during the hiring process. Huddleston claims, based on both her own testimony and that of Mr. Payne, that Morton could not possibly have placed any significance on the incident in making the decision because the incident had not even occurred at the time she was being considered for the job. Both Huddleston and Payne testified that the incident did not occur until sometime in 1996, well after Murphy had been hired as the principal of Fruithurst Elementary. Huddleston thus concludes that Morton's alleged reliance on the incident evidences the fact that his stated reasons for the decision are disingenuous. Huddleston contends that Morton's claim that he relied, to any degree,

on the Payne incident, casts doubt upon all of the other incidents articulated by the defendants and provides a reasonable jury sufficient reason to dismiss defendants stated explanations as pretext. Defendants, in replying to Huddleston's argument against summary judgment and her concentration upon this point, stress the fact that Morton claims to have placed heavy reliance on the reference forms and seem to imply that Morton's mistake with regard to this point is immaterial in that he considered other factors to be far more important.[5]

Finally, Huddleston argues that Morton's claim that as many as ten teachers approached him to express their view that Huddleston should not be principal is not worthy of belief in that Morton is unable to expressly articulate any of the concerns voiced by those teachers and is unable to identify any of the teachers who allegedly spoke with him. Additionally, Huddleston contends that Morton, given his policy of confronting personnel with performance problems and criticisms, would have told Huddleston of these statements if they were worthy of consideration in the hiring process. Morton, however, never did speak with Huddleston about the teachers' concerns. Additionally, Morton claims that he put very little credence in the teachers' comments. Thus, argues Huddleston, if any teachers did voice concerns about her becoming principal at Fruithurst, Morton did not rely upon such statements in deciding against Huddleston.

## D. Discriminatory Reason as Motivation for the Hiring Decision

Huddleston claims that a reasonable jury could infer that a discriminatory reason more likely motivated the defendants' decision to hire Murphy than did the supposed legitimate,

---

[5] The Payne incident is only mentioned in passing in the defendants' summary judgment brief, though it is mentioned as a concern of Morton's. Morton does, in his deposition testimony, claim to have considered the incident in deciding against Huddleston, but does put more emphasis on the reference forms he received.

18

nondiscriminatory reasons provided by the defendants. She claims that the Board has a history of hiring only males as administrators and notes Morton's testimony indicating that he could remember only one woman holding an administrative position in the school system prior to his becoming superintendent and that he could not recall any females being given jobs as principals or assistant principals prior to his arrival. Huddleston also argues that, even though Morton took part in the hiring of Ms. Turley as principal of Fruithurst just two years prior to hiring Murphy, the unusual circumstances under which Turley was terminated give rise to an inference of discriminatory intent.

According to Morton, Turley was the best-qualified candidate for the position of principal at Fruithurst when she applied in 1993. Morton also testified that she did an exemplary job as principal of the school and that, compared to the male administrators in the system, her work was "very excellent." However, despite what Morton perceived to be her superior performance, the Board refused to renew her contract for a third year because the Board member for Fruithurst's district stated that the Board would not accept Turley back. Huddleston thus contends that, rather than evidencing a willingness on the part of the Board to hire women as administrators, Turley's experience illustrates the discriminatory approach taken by the Board in employing females. The fact that Turley was fired despite her "excellent" work as compared to male administrators indicates, according to Huddleston, the Board's bias against female administrators.

Further exhibiting the Board's bias against female administrators, according to Huddleston, is the experience of Sara Clegg. Ms. Clegg was one of Morton's part-time assistant principals during his years as a principal at Cleburne County High School. Morton claims that she was a top notch administrator but that, despite his recommendation to the contrary, the Board, for reasons unknown to Morton, refused to hire her as a full-time assistant when the full-time position was vacated. The

Board, in fact, refused to hire anyone as a full-time assistant principal during Morton's last three years at the high school. Once Morton left the high school, instead of hiring Clegg as Morton again recommended, the Board hired a male, Dennis McGourk to act as full time assistant to James Pirkle, Morton's successor. Huddleston argues that the experiences of Turley and Clegg point to a pattern and practice of gender discrimination in the Cleburne County School System and that a reasonable jury could, therefore, conclude that she was not hired as a result of gender discrimination.

Finally, Huddleston argues that the Board's process for hiring administrators was and is skewed against women in that only males take part in the interview process and only males are involved in the decision making process. She notes that only the superintendent and Board members take part in the interviewing of candidates and that, therefore, only males are involved. She argues that Morton, if he had desired, could have included women in the process, but chose not to. Thus, she claims that the process by which candidates were interviewed and decided upon was inherently biased in favor of males and that a jury could find that the process was driven by a discriminatory motive.

## IV. Defendants' Reply

In replying to Huddleston's attempt to discredit their legitimate, nondiscriminatory reasons for not hiring her, the defendants claim that, given Morton's acknowledged heavy reliance on the reference forms, the plaintiff must provide sufficient evidence to permit a finding that Morton did not rely on the references of Pirkle and Chambless. Defendants contend that Huddleston has not offered any evidence suggesting that Morton did not rely on the references in making his decision to recommend Murphy for the position, but only that, perhaps, Morton should not have relied upon the references. According to the defendants, plaintiff's argument is identical to that advanced by the

plaintiff in <u>Lewis-Calhoun v. City of Jackson</u>, 977 F.Supp. 1148 (S.D.Ala. 1997), <u>aff'd</u>, 152 F.3d

935 (11th Cir. 1998).

## A. **Lewis-Calhoun v. City of Jackson**

In <u>Lewis-Calhoun</u>, the plaintiff, an African American female, submitted an application for

employment with the City of Jackson as a police officer and dispatcher. When she applied for the

Jackson position, the plaintiff had acted as a police officer in the City of Thamesville for the

previous three years, had completed the police academy, had served as a security officer with a

security company in Alabama, worked for nearly two and one-half years for the Department of

Corrections, and had served as a switchboard operator with the National Guard for nearly ten years.

Plaintiff was interviewed for the position of radio communications officer (RAO) by the chief

of police in Jackson. Following the interview, the police chief spoke with two City of Jackson

employees about any information they might have about the plaintiff. Both of the employees

provided unfavorable recommendations. The first, Peggy Kelly, had, prior to working for Jackson,

worked as the dispatcher for the City of Thamesville. Kelly stated that she did not think plaintiff

would do a good job as an RAO because of her experience as a police officer and the substantial

change in duties that plaintiff would be subjected to. Kelly also told the police chief that it was her

understanding from officers in Thamesville that plaintiff was not a motivated employee. The second

employee, Michael Hunt, was a narcotics officer with the City of Jackson. He told the police chief

that it was his understanding that plaintiff had left the Department of Corrections because she had

been found asleep on her tower post during job hours. Hunt also expressed concern about the fact

that the plaintiff would be taking a substantial pay cut in order to come work in Jackson. Following

the plaintiff's interview and the chief's discussions with Kelly and Hunt, the City hired two white males to serve as RCAS. Neither of the two males had any experience with police work or with radio communications. The two clearly lacked the objective credentials boasted by the plaintiff. Both, however, were given good recommendations by their former employers/supervisors, a grocery store supervisor and a hardware store owner.

The plaintiff filed suit under Title VII alleging race and/or sex discrimination. The defendants moved for summary judgment, using, among other considerations, the two negative references as legitimate, nondiscriminatory grounds for the decision. Plaintiff maintained that both of the two references were unreliable and provided insufficient as grounds for deciding not to hire her. She argued that Kelly lacked the first hand knowledge about plaintiff's abilities and work habits that would have been necessary to form a reasonable opinion and contended that the chief did not go into detail with Kelly about her unfavorable statements. Plaintiff also claimed that Hunt's comments were not based on personal knowledge of the plaintiff and that Hunt did not say anything bad about the plaintiff. Plaintiff then argued that the evaluators' lack of reliable knowledge and information about her should have prevented the chief from using their comments in making his decision and that there existed enough evidence to allow the factfinder to disbelieve the defendants' assertion that the chief had relied on the recommendations. The district court, however, disagreed, stating that:

> Plaintiff confuses disagreement about the wisdom of an employer's reason with disbelief about the existence of that reason and its application in the circumstances. quoting Combs, 106 F.3d at 1543. . . Reasonable people may disagree about whether [the chief] should have relied on [the recommendations] without further inquiry, but such disagreement does not create a basis to disbelieve [the chief's] explanation that he in fact based his decision on the unfavorable recommendation.

Id. at 1154; See also Combs, 106 F.3d at 1543. The Lewis-Calhoun court went on to further quote the Eleventh Circuit's opinion in Combs, stating:

> [Federal courts do not sit and second-guess business judgment of employers. Stated somewhat differently, a plaintiff may not establish that an employer's proffer [sic] reason is

> pretextual merely by questioning the wisdom of the employer's reason, at least not where, as here, the reason is one that might motivate a reasonable employer.

Id. at 1154, quoting Combs, 106 F.3d at 1543.  The court thus granted the summary judgment motion.  The Eleventh Circuit upheld the district court's decision without opinion.  Lewis-Calhoun v. City of Jackson, 152 F.3d 935 (11th Cir. 1998).

Defendants contend that the situation presented to the court in this matter is nearly identical to that presented in Lewis-Calhoun and that any differences operate in favor of the Board and Morton.  Defendants argue that the undisputed facts establish that, whether or not he should have done so, Morton did rely on the references provided by Chambless and Pirkle in making his decision.  Defendants point out that, in contrast to the situation in Lewis-Calhoun, the evaluators sought out by Morton had at least some actual first-hand personal knowledge of the plaintiff and her skills.  Additionally, the defendants note that Murphy, unlike the applicants in Lewis-Calhoun, was not lacking in experience, education or abilities.  Rather, he had less education and/or experience than some of the other candidates, including Huddleston.  However, despite Murphy's lower level of education and experience, the Morton and Board decided that he possessed other qualities that made him better qualified for the position than any other candidate, male or female.

**B. Other Candidates**

Defendants also point out that several of the other candidates were more objectively qualified for the position than was Murphy.  Dennis Maguire, who applied for the position, had been with the school system for twenty years, had a master's degree, and had served as an assistant principal in the system for about seven years.  Arguably, Maguire was better qualified, objectively speaking, than either Murphy or Huddleston, for neither had any prior administrative experience.  Nonetheless, Maguire was not offered the job by the Board.  The apparent reason for this is the fact that Pirkle's evaluation of Maguire suggested that Maguire would not make a good principal because of his attitude toward the job.  Defendants point out that, according to Huddleston's argument, if Maguire

could show that he was a member of a suspect class, he could reasonably claim that he was somehow discriminated against because he was not selected as a result of a subjective factor. Defendants contend that at least one of the other male applicants could make the same argument.

## V. Court's Conclusions

The court starts with the assumption that plaintiff has presented sufficient evidence to establish a prima facie case. This is based upon a determination that (1) plaintiff is female, (2) she applied for the job, (3) she was at least minimally qualified for the job, and (4) the job was given to a male.

It would be inappropriate for the court to weigh the relative qualifications of the two applicants in determining whether plaintiff has proved a prima facie case. It is clear, however, that the defendants have articulated legitimate, non-discriminatory reason(s) for their actions. Plaintiff, thus, is required to demonstrate that the stated reason(s) were pretextual. Three recent Eleventh Circuit cases throw light on the standards the court must apply in evaluating plaintiff's evidence

In Bogle v. Orange County Bd. of City Com'rs., 162 F.3d 653 (11th Cir. 1998), the court, inter alia, stated:

> Finally, we may affirm a judgment as a matter of law only if the facts and inferences "point so overwhelmingly in favor of the movant . . . that reasonable people could not arrive at a contrary verdict." Id. (citations and internal quotation omitted).
>
> . . .
>
> Once Bogle introduced Orange County's legitimate nondiscriminatory reason for his discharge, the initial presumption of discrimination accompanying the prima facie case dissolved, and the McDonnell Douglas framework required Bogle to demonstrate that the stated reason was pretextual. Combs, 106 F.3d at 1528.

. . .

Accordingly, Orange County was not entitled to judgment as a matter of law if Bogle produced any evidence that would permit a reasonable jury to disbelieve the proffered reasons for his discharge. (footnote omitted).

. . .

See Fed.R. Civ. P. 50(a)(1); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L. Ed.2d 265 (1986)(noting that the standard for a directed verdict and summary judgement are the same and that the absence of evidence on an essential element of a party's case will support judgment as a matter of law against that party); Reeves v. City of Jackson, 532 F.2d 491, 494 (5th Cir. 1976)("If, after a full development of the facts the plaintiff's cause is too weak to string the Constitution's bow or unsheath the sword provided for the redress of such grievances . . . it may be washed out on summary judgment . . . or, if it gets beyond that, by motion for directed verdict . . . at the end of the plaintiff's case. . ..")

In Standard v. A.B.E.L. Services, Inc., ___ F.3d ___ (11th Cir. 1998), the court, inter alia,

stated:

In order to establish a case under Title VII, a plaintiff may use three different kinds of evidence of discriminatory intent: direct evidence, circumstantial evidence or statistical evidence. The analytical framework and burden of production varies depending on the method of proof chosen.

. . .

Once Standard established his prima facie case, Plaster Concepts needed to rebut the presumption of discrimination by advancing legitimate, nondiscriminatory reasons for Standard's discharge. This is a burden of production, nor persuasion. Plaster Concepts need only produce evidence that could allow a rational fact finder to conclude that Standard's discharge was not made for a discriminatory reason. Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997), cert. denied, ___ U.S. ___, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998).

. . .

By presenting legitimate, nondiscriminatory reasons for Standard's termination, Plaster Concepts has rebutted the presumption of discriminatory intent. In light of this, Standard must now create a genuine issue of material fact as to whether the reasons advanced are pretextual. In other words, Standard must provide sufficient

evidence to allow a reasonable fact finder to conclude that the proffered reasons were not actually the motivation for his discharge. Combs, 106 F.3d at 1538. Standard may do this (1) by showing that the legitimate non-discriminatory reasons should not be believed; or (2) by showing that, in light of all of the evidence, discriminatory reasons more likely motivated the decision than the proffered reasons. Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1376 (11th Cir. 1996) (quoting Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207(1981)).

. . .

Such explanation of a general reasons is insufficient to show pretext. Id., at 1377 (holding that plaintiff failed to show pretext when the employer's later statements merely offered more detail regarding perceived performance problems).

. . .

The district court found that his kind of minimal, technical discrepancy is insufficient to show pretext, and we agree.

. . .

The pretext inquiry is concerned with the employer's perception of the employee's performance, not the employee's own beliefs. Holifield v. Reno, 115 F.3d 1555, 1565 (11th Cir. 1997)(holding that when employer produces negative performance reviews, employee's assertion of his own good performance is insufficient to defeat summary judgment).

. . .

The heart of the pretext inquiry is not whether the employee agrees with the reasons that the employer gives for the discharge, but whether the employer really was motivated by those reasons.

. . .

In order to directly attack Plaster Concepts' reasons, Standard must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find [all of those reasons] unworthy of credence." Combs, 106 F.3d at 1538.

. . .

"[A] plaintiff may not in all cases merely rest on the laurels of her prima facie case

in the face of powerful justification evidence offered by the defendant." Grigsby v.
Reynolds Metals Co., 821 F.2d 590, 596 (11th Cir. 1987).

Both Bogle and Standard cite and rely upon Combs v. Plantation Patterns, 106 F.3d 1519

(11th Cir. 1997) where the trial court's judgment was reversed for failure to grant judgment as a

matter of law. The court, inter alia, stated:

> . . . According to the Supreme Court:

>> [The plaintiff] now must have the opportunity to demonstrate that the
>> proffered reason was not the true reason for the employment decision
>> . . . . [The plaintiff] may succeed in this either directly by persuading
>> the court that a discriminatory reason more likely motivated the
>> employer or indirectly by showing that the employer's proffered
>> explanation is unworthy of credence.

> Id. at 256, 101 S.Ct. at 1095 (emphasis added)(citation omitted). In other words, the
> plaintiff has the opportunity to come forward with evidence, including the previously
> produced evidence establishing the prima facie case, sufficient to permit a reasonable
> factfinder to conclude that the reasons given by the employer were not the real
> reasons for the adverse employment decision. Id.; McDonnell Douglas, 411 U.S. at
> 804, 93 S.Ct. at 1825.

> Although the Supreme Court in Hicks rejected the position that disbelief of the
> employer's proffered reasons requires judgment for the plaintiff, the Court was
> careful to explain that such disbelief, in tandem with the plaintiff's prima facie case,
> is sufficient to permit the factfinder to infer discrimination. The Court said:

>> The factfinder's disbelief of the reasons put forward by the defendant
>> (particularly if disbelief is accompanied by a suspicion of mendacity)
>> may, together with the elements of the prima facie case, suffice to
>> show intentional discrimination. Thus, rejection of the defendant's
>> proffered reasons will permit the trier of fact to infer the ultimate fact
>> of intentional discrimination, and the Court of Appeals was correct
>> when it noted that, upon such rejection, "[n]o additional proof of
>> discrimination is required."

> Id. at 511, 113 S.Ct. at 2749 (quoting Hicks v. St. Mary's Honor Ctr., 970 F.2d 487,
> 493 (8th Cir. 1992)) (footnote omitted) (second emphasis added). That is a pretty

clear statement.

. . .

Based on the Supreme Court's clear statement in the majority opinion in Hicks, read together with the rationale of the dissenting justices, we understand the Hicks Court to have been unanimous that disbelief of the defendant's proffered reasons, together with the prima facie case, is sufficient circumstantial evidence to support a finding of discrimination. Therefore, it follows from Hicks that a plaintiff is entitled to survive summary judgment, and judgment as a matter of law, if there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged action.

. . .

Thus Hairston, our first decision on this issue following Hicks, clearly held that one way a plaintiff may succeed in establishing discrimination is by showing that the employer's proffered explanations are not credible. When that happens, the plaintiff may or may not ultimately prevail in the litigation, because the factfinder may or may not choose to make the permissible inference of discrimination. However, as we explained in Hairston, once the plaintiff introduces evidence sufficient to permit the factfinder to disbelieve the employer's proffered explanations, summary judgment is not appropriate, because "[i]ssues of fact and sufficiency of evidence are properly reserved for the jury." Id. at 921. We said nothing in Hairston about the plaintiff being required to establish anything more than a prima facie case plus the falsity of the tendered explanations; we said nothing about anything else being required for the plaintiff to avoid summary judgment, because nothing else is required.

. . .

Because the plaintiff in Batey had produced sufficient evidence for the factfinder to disbelieve the reasons that the employer proffered for the employment decision, we reversed the district court's grant of summary judgment for the employer. Id. at 1335-36. Consistent with our Hairston precedent, and with Hicks, we held that evidence of pretext, when added to a prima facie case, is sufficient to create a genuine issue of material fact that precludes summary judgment. Id.

. . .

In Walker v. NationsBank of Florida, 53 F.3d 1548 (11th Cir. 1995), a panel of this Court affirmed the grant of judgment as a matter of law in favor of the employer in an age and sex discrimination case, even though the plaintiff had established a prima facie case and had put on evidence sufficient to permit the factfinder to disbelieve all

of the employer's proffered reasons for the adverse employment action. Id. at 1556-58. Despite that evidence, the Walker panel said that "Walker did not produce evidence that raised a suspicion of mendacity sufficient to permit us to find on this record that the bank intentionally discriminated against her on the basis of age and/or sex." Id. at 1558. For that reason, the panel concluded that "[r]easonable and fair-minded persons, in the exercise of impartial judgment, would not conclude that the bank had discriminated against [the plaintiff] on the basis of her age or sex." Id.

In a concurring opinion, Judge Johnson accurately noted that the majority had exceeded it proper role by "deciding whether evidence of pretext supports an inference of intentional discrimination," a task that requires credibility determinations and the weighing of evidence--which is the jury's function. Id. at 1563 (Johnson, J., concurring). As Judge Johnson pointed out, 53 F.3d at 1561-62, the majority's reasoning was not consistent with the teaching of Hicks, or without decisions in Howard and Batey. Judge Johnson agreed with the result in Walker only because, in his view, the evidence was not sufficient to permit a factfinder to reject the employer's proffered reasons for its action. Id. at 1564-65.

As we have recognized before, "no one is perfect, least of all federal appellate judges, and from our mistakes and oversights spring inconsistent decisions which we must deal with as best we can." United States v. Hogan, 986 F.2d 1364, 1369 (11th Cir. 1993). The Walker decision is a mistake. not only is Walker inconsistent with the Supreme Court's clear instruction in Hicks, but is also inconsistent with the holdings of our Hairston, Batey, Howard, and Cooper-Houston decisions. Where there are inconsistent panel decisions, "the earliest panel opinion resolving the issue in question binds this circuit until the court resolves the issue en banc." United States v. Dailey, 24 F.3d 1323, 1327 (11th Cir. 1994) (quoting Clark v. Housing Auth. of Alma, 971 F.2d 723, 726 n. 4 (11th Cir. 1992)). our next decision on the issue at hand is consistent with that principle, because it followed the law established in the earlier decisions instead of the Walker decision.

. . .

To summarize, with the exception of Walker, which is an anomaly, this circuit's post-Hicks decisions uniformly hold that once a plaintiff has established a prima facie case and has put on sufficient evidence to allow a factfinder to disbelieve an employer's proffered explanation for its actions, that alone is enough to preclude entry of judgment as a matter of law.

In discussing a hypothetical posed in a somewhat discredited Isenbergh opinion, the court stated:

. . . The issue upon which judgment as a matter of law turns is whether the

employer's proffered nondiscriminatory reason for its action, excessive lateness, may reasonably be disbelieved, not whether the employee was late nine times as opposed to seven.

. . .

In the hypothetical set up in the Isenbergh opinion, there is no evidence to discredit the employer's explanation that the defendant was fired for excessive lateness; the defendant's reason for its action remains unrebutted. So, the employer would be entitled to judgment as a matter of law under Hicks, 509 U.S. at 515-18, 113 S.Ct. at 2751-53 (discussing plaintiff's burden of discrediting the defendant's explanations), and under all of our prior decisions, including Hairston, Batey, and Howard.

. . .

When deciding a motion by the defendant for judgment as a matter of law in a discrimination case in which the defendant has proffered nondiscriminatory reasons for its actions, the district court's task is a highly focused one. The district court must, in view of all the evidence, determine whether the plaintiff has case sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered "legitimate reasons were not what actually motivated its conduct," Cooper-Houston v. Southern Ry. Co., 37 F.3d 603, 605 (11th Cir. 1994)(citation omitted). The district court must evaluate whether the plaintiff has demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Sheridan, 100 F.3d at 1072 (citation and internal quotation marks omitted); see also Walker, 53 F.3d at 1564 (Johnson, J., concurring)(discussing methods of proving pretext). However, once the district court determines that a reasonable jury could conclude that the employer's proffered reasons were not the real reason for its decision, the court may not preempt the jury's role of determining whether to draw an inference of intentional discrimination from the plaintiff's prima facie case taken together with rejection of the employer's explanations for its action. At that point, judgment as a matter of law is unavailable.

. . .

. . . We must, in view of all the evidence, determine whether the plaintiff has case sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered "legitimate reasons were not what actually motivated its conduct," Cooper-Houston v. Southern Ry. Co., 37 F.3d 603, 605 (11th Cir. 1994)

In Combs, the employer gave three reasons as to why it had promoted Walker instead of Combs. The appellate court determined that the plaintiff had submitted sufficient evidence to allow a reasonable juror to conclude that two of the articulated reasons did not actually motivate the employer's decision. The court held, however, that the district court had erred in not granting judgment as a matter of law because,

> In relying on Walker's financial improprieties to undermine Meadowcraft's explanation that it based its promotion decision on Walker's superior supervisory experience, Combs confuses disagreement about the wisdom of an employer's reason with disbelief about the existence of that reason and its application in the circumstances. Reasonable people may disagree about whether persons involved in past financial improprieties should be made supervisors, but such potential disagreement does not, without more, create a basis to disbelieve an employer's explanation that it in fact based its decision on prior non-financial supervisory experience. Meadowcraft's decision to promote Walker instead of Combs may seem to some to be bad business judgment, and to others to be good business judgment, but federal courts do not sit to second-guess the business judgment of employers. Stated somewhat differently, a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, at least not where, as here, the reason is one that might motivate a reasonable employer.

The court added,

> . . . Combs failed to produce evidence sufficient to permit a reasonable factfinder to disbelieve Meadowcraft's proffered nondiscriminatory explanation that it promoted Walker instead of Combs because Walker had superior supervisory experience. Because of that failure, the district court should not have permitted the case to go to the jury. Meadowcraft was entitled to judgment as a matter of law.

Combs indicates that a plaintiff cannot prevail merely because he or she casts doubt on one or more of a defendant's suggested reason(s) if the evidence does not raise a substantial issue about the credibility of the other reason(s).

This court will now undertake the "highly focused" task of determining whether "the plaintiff has cast sufficient doubt on the defendant[s'] proffered nondiscriminatory reasons to permit a

reasonable factfinder to conclude that the [defendants'] proffered legitimate reasons were not what actually motivated [their] conduct." Combs, supra.

It is clear that the defendants' primary reason for not promoting plaintiff were the negative or tepid references from plaintiff's prior supervisors. Defendants acknowledge that plaintiff had degrees in excess of those of Murphy. They maintain, however, that leadership and administrative abilities are also important in school principals. This court cannot "second-guess [this education related] judgment of the [defendants]" Combs, supra. Neither the plaintiff nor the court can simply question "the wisdom of the employer's reason" if, as here, the reason is one that might motivate a reasonable employer." Combs, supra. See also Ezold v. Wolf, Block, et al., 983 F.2d 509 (3d Cir. 1992).

Thus, the court must determine if the plaintiff has raised substantial doubt as to defendants' primary reason so as to create a reasonable inference of intentional discrimination. In addition to simply suggesting that defendants should have been solely guided by a consideration of her superior degrees, plaintiff adds the following which the court will address:[6]

(1)     Preference should have been given to minority candidates who are equally qualified for a position as non-minorities. This court's judgment based upon a similar argument was reversed in Clark v. Huntsville Bd. of Educ., 717 F.2d 525 (11th Cir. 1983). There, the court said that the issue was whether there was evidence that the decision maker had acted in bad faith in making the decision with regard to relative qualifications even where there was a preference provision in effect.

_____

[6]The court cannot agree that defendants not being solely guided by plaintiff's degrees and teaching years, in and of itself, raises an inference of incredibility or discrimination. If this were true, every such decision would simply be reduced to a mechanical one. Plaintiff's primary argument is that her on paper credentials should have been the primary consideration. Her other arguments are attempts to stretch ordinary circumstances into bad motives.

32

The court agrees that this evidence aids plaintiff in determining that she has proved a prima facie case. It does not, however, rebut the bona fides of the given reason.

(2)     Plaintiff complains that she was "discouraged" from submitting her own references. She does not assert, however, that Morton considered references submitted by other applicants [particularly Murphy). Further, plaintiff indicates as a "discouragement" is an embellishment of what the depositions reveal. The depositions reflect, taking the evidence most favorably to plaintiff, that she asked if she "needed" references and was told "no." There is no evidence that Morton told her not to submit references or "discouraged" her from doing so. Further, plaintiff states (with reference to her application), "I listed some college professors and former superintendents, as I recall."

(3)     Plaintiff makes the argument that since Pirkle stated that "As an administrator I can't say, I would just be guessing but I probably would not hire her," it was unreasonable for Morton to rely upon the statement and, thus, a reasonable juror could conclude that he didn't rely upon it. The court cannot accept this rather strained argument. Pirkle also stated, "I really feel it would be a huge change for her to make. I'm really not sure if she could handle it. A <u>big</u> question mark." This was certainly not a ringing endorsement. "[T]he reason is one that might motivate a reasonable employer." <u>Combs</u>, supra. Plaintiff has acknowledged that Pirkle's statement was not favorable to her. Plaintiff suggests that Chambless was not a good reference choice because he himself was a poor administrator.[7] Assuming that Morton was aware of this suggestion (the court will leave it

---

[7]Plaintiff testified that Pirkle was a good supervisor. She testified that Chambless, as a supervisor, was "hot and cold." Plaintiff seems to make some argument that her evaluations did not reveal the negative matters Morton relied upon. Apparently she was never evaluated as a supervisor. Further, the issue is what Morton considered, either in good faith or with bad motive. There is no substantial evidence of a bad motive.

33

to the parties to determine if the record reflects that Morton was so aware), it still stands that Chambless had been a supervisor of plaintiff and that it was not unreasonable to inquire of him.

(4)     Plaintiff argues that Morton's reliance on references was subjective and, thus, inappropriate. Assuming, without deciding, that such reliance by Morton can be deemed to be his subjectivity, the court concludes that it does not totally undermine the reasonableness of his decision. See Fowler v. Blue Bell, Inc., 737 F.2d 1007, 1010-11 (11th Cir. 1984) and Thompkins v. Morris Brown College, 752 F.2d 558, 564, n. 16 (11th Cir. 1985).

It is a standard practice for employers, including lawyers and judges, to consider references in making employment decisions.

(5)     Morton erroneously stated that he relied upon a conflict between Rudy Payne and plaintiff because it only happened later. As held in Combs, supra, and Standard, supra, mistaken reason(s) do not invalidate other reasons. The same applies to plaintiff's argument with reference to the teachers who allegedly stated that plaintiff should not be made principal.

(6)     While plaintiff has acknowledged that her case cannot be established by statistical evidence, she makes a blanket argument with reference to the small number of female principals. This is an attempt at statistical evidence in a different guise. In order to be admissible, such evidence must be statistically relevant. See Brown v. American Honda Motor Co., Inc., 939 F.2d 946 (11th Cir. 1991)("statistics such as these, however, without an analytical foundation, are virtually meaningless.")

(7)     It is clear here that the motivated decision maker was Morton. Morton recommended that Turley (female) be hired. There is no evidence that Morton did not want her retained. The failure of the Board to want Turley retained does not make Morton's decision here suspect. Morton

34

also recommended Sara Clegg. His decision here is not suspect because the Board did not hire her. In effect, plaintiff has taken two instances wherein Morton's position was favorable to women and somehow attempts to convert them into improper motivation with regard to her.

(8)     While Morton and the Board members are all males, that does not, in and of itself, make Morton's recommendation suspect. If it did, all decisions would be suspect. While it is a consideration, it is not entitled to significant weight here.

The court ultimately concludes, as the court did in Combs, that the evidence is insufficient for a reasonable finder of fact to "disbelieve [the defendants'] proffered nondiscriminatory explanation . . . ." See also Lewis-Calhoun discussed above. The court concludes that there is not a genuine issue for trial. Defendants' motion for summary judgment will be granted.[8]

This ___3rd___ day of February, 1999.


ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE

---

[8]See also Lawrence v. Univ. of Texas Medical Branch at Galveston, 163 F.2d 309 (5th Cir. 1999).